UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| IN RE | : | CASE NO. 15-50748 |
| | : | |
| HARVEST OIL & GAS, LLC, *ET AL*[1] | : | CHAPTER 11 |
| | : | |
| DEBTORS. | : | JOINTLY ADMINISTERED |

### MOTION FOR AN ORDER EXTENDING THE TIME PERIODS WITHIN WHICH THE DEBTORS HAVE THE EXCLUSIVE RIGHT TO FILE A PLAN OF REORGANIZATION AND TO OBTAIN ACCEPTANCES OF A PLAN OF REORGANIZATION

**NOW INTO COURT,** through undersigned counsel, come Harvest Oil and Gas, LLC, Saratoga Resources, Inc., The Harvest Group LLC, Lobo Operating, Inc. and Lobo Resources, Inc., as debtors and debtors-in-possession (collectively, the "Debtors" or "Company"), who respectfully move this Court for an extension of the exclusive periods in which a plan of reorganization may be filed and acceptances of a plan of reorganization may be obtained (the "Motion to Extend Exclusivity") pursuant to section 1121(d) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). In support of the Motion to Extend Exclusivity, the Debtors aver:

### JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[1] Saratoga Resources, Inc. (15-50749); The Harvest Group LLC (15-50750); LOBO Operating, Inc. (15-70751); and LOBO Resources, Inc. (15-50752) are being jointly administered with Harvest Oil & Gas, LLC (15-50748) pursuant to a court order [P-4] entered on June 19, 2015.

{00349018-3}

# GENERAL BACKGROUND

**A.  Bankruptcy Proceedings**

2.  On June 18, 2015, the Debtors filed for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  On June 19, 2015, the Court entered an order [P-4] that these chapter 11 cases be jointly administered and consolidated for procedural purposes.

3.  On July 24, 2015, an official unsecured creditors committee (the "Unsecured Creditors Committee") was appointed by the United States Trustee [P-171].  On September 4, 2015, the Court entered an order [P-397] authorizing the employment of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard as counsel for the Unsecured Creditors Committee.

4.  On August 11, 2015, an official committee of equity holders ("Equity Committee") was appointed by the United States Trustee [P-290]. This Court has taken under advisement the application [P-311] to employ Gardere Wynne Sewell LLP as counsel to the Equity Committee.

5.  On August 3, 2015, the Debtors filed their schedules and statements of financial affairs. On August 17, 2015, the meeting of creditors pursuant to Section 341 was held and completed in Lafayette, Louisiana.

6.  The Debtors have filed their monthly operating reports [P-216] and [P-357] on a timely basis and duly complied with all requests for information by the United States Trustee.

7.  On August 24, 2015, this Court entered an order [P-338] ("Bar Date Order") approving the *Ex Parte Motion for an Order (A) Establishing a Bar Date Bar Date and Governmental Bar Date for Filing Proofs of Claim, (B) Approving the Bar Date Notice, (C)*

*Authorizing the Debtors to Provide Notice of the Bar Date, and (D) Providing for Other Relief Sought Herein* [P-320] and establishing a bar date of October 15, 2015 at 4:30 p.m. CDT and a governmental bar date of December 15, 2015 at 4:30 p.m. CDT. The Debtors served the *Notice of Claims Bar Date* [P-340], and claims are being filed in the cases on an ongoing basis.

8. As this Court is fully aware, the Debtors have been involved in extensive litigation with respect to the Debtors' use of cash collateral and corporate governance issues. On September 22, 2015, this Court entered the *Final Cash Collateral Order* [P-481], authorizing the Debtors' use of cash which may be cash collateral to pay their operating expenses and all costs of administration through October 30, 2015. Additionally, as part of the approval of the Final Cash Collateral Order, this Court ruled that the Debtors' Independent Committee, rather than senior management, is in charge of the Debtors' restructuring. In light of that ruling, the Independent Committee on behalf of the Debtors can now focus its attention on negotiating a settlement, if possible on fair and reasonable terms, with the Debtors' constituencies, particularly the Noteholders, Unsecured Creditors Committee (and hopefully, the Equity Committee). Until the rulings on September 21, 2015, settlement efforts of the Debtors have been stymied, especially since the Equity Committee refused to engage in settlement discussions, spending its time and energy in continuing to support management's efforts to change the corporate governance of the Debtors, so that management, and not the Independent Committee, could control the Debtors reorganization.

9. The Debtors have been in ongoing but sporadic settlement discussions with the Noteholders and the Unsecured Creditors Committee about an exit plan, and those settlement discussions can be revived with the clarity provided by the Court over the authority of the Independent Committee. There is no reason that a settlement cannot be reached on fair and

reasonable terms among the Debtors, the Noteholders, the UCC and the Equity Committee (if the Equity Committee would participate; and if not, with equity as best protected as it can be within the Debtors' business judgment). And if an overall settlement cannot be reached, then perhaps there can be an agreement among most of the major constituencies in the cases and a plan based on that agreement.

10. Under the most recent settlement offer from the Noteholders, the Noteholders had agreed in concept to provide the Company an opportunity to buy out their debt for an approximate $90 million discount on their second lien debt of $152.1 million (as of 12/31/15) with a fallback position available to the Company if the Company is unable to secure financing to execute on the discounted debt buy out. Accordingly, under that concept, the overall pre-petition debt on the Company to be paid off through a capital raise would be reduced as of December 31, 2015 from about $217-220 million to $135-138 million. The idea of a discounted payoff for cash is an opportunity for the Debtors, and especially for the shareholders, although the present capital market for raising that amount seems discouraging at present (so perhaps some negotiations surrounding the amount of the discount are worth having). Based on the absolute priority rule, the pre-petition debt which must be paid in full by cash or over time with interest or somehow satisfied in full under a plan so that existing equity holders may retain any equity interests in the reorganized Debtors would be reduced by the amount of the discount. .

11. The latest settlement offer of the Noteholders also provides another restructuring option - Option 2. Under that option, the Noteholders have offered to de-leverage the Debtors by converting the entirety of the second lien debt ($125 million plus interest) to new equity, and recapitalizing the Debtors by subordinating their existing first lien debt of $60.6 million to a new working capital first lien loan of $30 million, with the loan proceeds to be used for working

capital, and drilling and development expenses. Earlier in the negotiations, the Debtors proposed that the Noteholders should receive 85% of the new equity in the newly delivered and recapitalized Debtors and that existing equity holders should receive 15%. The Noteholders responded that the Noteholders should receive 95% of the new equity and the existing equity holders should receive 5%. Such was the status of plan negotiations when the Equity Committee was appointed. Perhaps a deal can be negotiated somewhere between 5% and 15%, if all constituencies realistically look at the risks of not reaching a deal. This was the status of the negotiations when the Equity Committee was appointed and invited. The Debtors invited the Equity Committee to participate in those discussions, an invitation which heretofore was spurned because Equity Committee chose to continue to assist management in seizing control of the bankruptcy cases. Now that the Court has confirmed the authority of the Independent Committee, the Debtors expect that the Equity Committee may reconsider its position and will participate in those discussions. As of the date of the filing of this Motion to Extend Exclusivity, that seems to be the situation as there have been indications of interest is settling expressed by counsel for the Equity Committee.

**B.     Debtors' Business Operations**

12.     The Debtors are a grouping of independent exploration and production companies, owners and operators (along with a holding company), focused on acquisition, development and production of natural gas and crude oil properties. Principal holdings cover approximately 52,000 gross/net acres, more than half of which are held by production without near-term lease expirations, comprised of principal producing properties covering approximately 32,000 acres in the transitional coastline and protected in-bay environment on parish and state

leases of south Louisiana, and approximately 20,000 acres of leases in the shallow Gulf of Mexico shelf.

13. The Debtors operate, or have interests in, 105 producing wells across 11 fields in the transitional coastline and protected in-bay environment on parish and state leases in south Louisiana, as well as in shallow waters of the Gulf of Mexico. The Debtors own approximately 100% working interest in substantially all of their properties with net revenue interests ranging from 70% to 82% and averaging, on a net acreage leasehold basis, approximately 75%.

## **REQUEST FOR EXTENSION OF EXCLUSIVITY PERIODS**

14. Pursuant to Section 1121(d), the Debtors have the exclusive right to file a plan of reorganization until October 16, 2015 and the exclusive right to obtain acceptances of a plan of reorganization until December 15, 2015 (such periods, together with any extensions, the "Exclusivity Periods"). Pursuant to this Motion to Extend Exclusivity, the Debtors request an extension of the Exclusivity Periods until December 15, 2015 for filing a plan of reorganization, and until February 15, 2015 to obtain acceptances of a plan of reorganization.

15. This Court, after notice and hearing, can increase these Exclusivity Periods "for cause" pursuant to Section 1121(d) of the Bankruptcy Code. The Debtors respectfully show that "cause" exists for an extension of the Exclusivity Periods.

16. As discussed above, the Debtors have been in lengthy settlement negotiations with the Noteholders, have included the Unsecured Creditors Committee in those negotiations, and have invited the Equity Committee to join. It is expected (maybe "hoped" would be a better word, since the Debtors' expectations regarding Equity Committee conduct have proved to be consistently wrong) that the Equity Committee will now do so. An extension of the Exclusivity

Periods to negotiate with parties in interest in a stable environment will benefit the entire reorganization process.

17. Although the Bankruptcy Code does not define "cause" justifying extensions of exclusivity, the legislative history indicates that the term "cause" in Section 1121(d) "is to be viewed flexibly 'in order to allow the debtor to reach an agreement.'" *In re McLean Indus., Inc.,* 87 B.R. 830, 833 (Bankr. S.D.N.Y. 1987)(citing H.R. Rep. No. 595, 95th Cong., 2d Sess. 231, *reprinted in* 1978 U.S.C.C.A.N., 5693, 6190); *see also In re Public Service Co. of New Hampshire*, 88 B.R. 521, 534 (Bankr. D.N.H. 1988) (stating that Chapter 11 was drafted to "afford maximum flexibility to the parties in structuring a plan of reorganization"); *In re Amko*, 197 B.R. 74, 77 (S.D. Ohio 1996) (court applied flexibility in dealing with question of exclusivity while considering nature of business and progress made).

18. Cause exists here for extending the Exclusivity Periods. These Chapter 11 cases are complex reorganization cases due to the number of entities; the number of creditors, and the layers and number of holders of secured debt.

19. The Debtors' request for an extension of the Exclusivity Periods to file a plan of reorganization and obtain acceptances meets the factors recognized by courts in granting such extensions. Courts have often identified the following factors, among others, as relevant in determining whether "cause" exists to extend exclusivity:

    a. the size and complexity of the case;

    b. the necessity of sufficient time to negotiate and prepare adequate information;

    c. the existence of good faith progress toward reorganization;

    d. whether the debtor is paying debts as they come due;

> e.  whether the debtor has demonstrated reasonable prospects for filing a viable plan;
>
> f.  whether the debtor has made progress in negotiating with creditors;
>
> g.  the length of time the case has been pending;
>
> h.  whether the debtor is seeking the extension to pressure creditors; and
>
> i.  whether unresolved contingencies exists.

*See, In re R.G. Pharmacy, Inc.*, 374 B.R. 484 (Bankr. D.Conn. 2007), *citing*, *In re Adelphia Comm. Corp.*, 352 B.R. 578, 586-587 (Bankr. S.D.N.Y. 2006). *See also, In re Friedman's, Inc.*, 336 B.R. 884, 888 (Bankr. S.D.Ga. 2005); *In re Service Merch. Co.*, 256 B.R. 744, 751 (Bankr. M.D.Tenn. 2000); and *In re Express One Intern., Inc.*, 194 B.R. 98, 100 (Bankr. E.D.Tex. 1996). Not all of these factors are relevant to every case, and courts often use a subset of factors to determine whether cause exists in a particular case. *See, eg. In re Hoffinger Indus., Inc.*, 292 B.R. 639, 644 (8th Cir. BAP 2003); *In re Express One Int'l, Inc.,* 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); *See also, In re Elder-Beerman Stores Corp.*, 1997 WL 1774880, *4 (S.D. Ohio 1997) ("a bankruptcy court faced with the issue of whether the necessary 'cause' exists to extend the exclusivity period has a high degree of flexibility in fashioning the appropriate test to be applied, and is not required to apply any particular set of factors, or number of factors, in every case"). The Debtors submit that consideration of these factors supports extending the Exclusivity Periods in these cases.

20. The first factor — the size and complexity of the case — weighs heavily in favor of an extension. These particular bankruptcy cases are large and complex. As discussed above, the Debtors operate, or have interests in, 105 producing wells across 11 fields in the transitional coastline and protected in-bay environment on parish and state leases in south Louisiana, as well as in shallow waters of the Gulf of Mexico, and are obligated as lessees on numerous

8
{00349018-3}

15-50748 - #483   File 09/23/15   Enter 09/23/15 16:58:49   Main Document   Pg 8 of 13

nonresidential real property leases. These cases involve five (5) related debtors, and the Debtors have had numerous issues to deal with in the early stages of the bankruptcy cases involving several constituencies. The bankruptcy cases are certainly large and complex by any standard. The total amount of the secured debt is approximately $212 million as of December 31, 2015, and is increasing by approximately $2.0 million per month. The unsecured debt is smaller, but could be in the range of $5-7 million. There are probably $1-2 million in priority claims. And, as the Court knows, claims often come in out of the wood work.

21. The second factor — the necessity of sufficient time to negotiate and prepare adequate information, and the sixth factor — whether the Debtors have made progress in negotiating with creditors (and equity)— are related and also weigh in favor of granting an extension of the Exclusivity Periods. Due to the size and complexity of these cases, the time and delay spent litigating corporate governance (including the related litigation over the disqualification of Gardere, the wholesale turnover to Gardere of hundreds of pages of confidential and many privileged documents) and working through the corporate governance issues inserted into the cash collateral process), and the minimal time (90 days) the bankruptcy cases have been pending, the Debtors obviously need additional time to work with the constituencies to engage in meaningful discussions of an exit strategy. The rulings of the Court on September 21, 2015 regarding the corporate governance issues have provided a fresh opportunity for the parties to escape the quicksand they were previously sinking into, and focus on plan negotiations. The Debtors need an extension of the Exclusivity Periods so those discussions will be free of the diversion and distraction that will accompany expensive litigation over "plan issues" that might be avoided if the parties are allowed sufficient time to negotiate those issues. As noted, the Debtors have already initiated negotiations with the Noteholders and

9
{00349018-3}

15-50748 - #483  File 09/23/15  Enter 09/23/15 16:58:49  Main Document  Pg 9 of 13

the Unsecured Creditors Committee and have made considerable process. Numerous term sheets and "lawyer think pieces" have been circulated to attempt to see if some other plan concepts might have the opportunity to gain traction. These actions in initiating discussions with creditors represent progress in negotiating with creditors. The opportunity to continue and expand these negotiations without prematurely filing a plan which does not enjoy wide support will facilitate the reorganization of the Debtors. Filing a plan at this time would create an impediment to negotiations, spur litigation, and undermine the parties' willingness to voluntarily share information and ideas.

22. The third factor — the existence of good faith progress towards reorganization, and the fifth factor — whether the Debtors have demonstrated reasonable prospects for negotiation a viable plan – also weigh in favor of an extension of the Exclusivity Periods. The Debtors have maintained an ongoing dialogue with the major creditors and have dealt with their creditors in good faith. The Debtors have also filed their schedules and statements of financial affairs and monthly operating reports on a timely basis, as required. There is good faith progress in these cases toward reorganization, but the terms and conditions of such a plan obviously have to be negotiated and agreed. If, however, the Debtors and the various constituencies do not ultimately agree on all plan issues, then any disputes over terms of the contemplated restructuring will be presented to this Court for mediation and/or resolution. Prospects are now very good for the reorganization of the Debtors.

23. With respect to the fourth factor - whether the Debtors are paying their ongoing costs of operations - the Debtors are paying their ongoing operating expenses as authorized by the Final Cash Collateral Order. Unlike many reorganization cases, the Debtors at this time do

not require any debtor in possession financing and are able to pay for the costs of their ongoing operations.

24. The seventh factor — the length of time the cases have been pending — also weighs in favor of granting the Debtors an extension. This is the first request by the Debtors to extend the Exclusivity Periods. The Debtors' cases have been pending for only three months, a short time considering the magnitude and complexity of these cases. Much of that time has been spent on unexpected litigation - now thankfully resolved - regarding the use of cash collateral and corporate governance issues. While dealing with that litigation, the Debtors have not been able to focus their full attention on plan negotiations with creditors and equity. From that perspective, these are still "new" bankruptcy cases, and this factor supports an extension of exclusivity.

25. With respect to the eighth factor – whether the Debtors are seeking an extension of exclusivity to pressure their creditors - there is absolutely no indication that the Debtors are using exclusivity to force an unfavorable plan of reorganization on their creditors or equity. The nature and conduct of the cases to date do not reflect any effort by the Debtors to misuse exclusivity or to unfairly pressure creditors or equity to consent to a "bad" plan. Considering the Court's ruling that the Independent Committee is in charge of leading the Debtors' restructuring process, there is finally a stable environment for future negotiations with creditors and equity which will serve the reorganization efforts well and should be maintained.

26. With respect to the ninth factor – whether there are unresolved contingencies that need to be addressed or understood before filing a plan – it is fair to observe that additional clarity regarding the impact of oil prices on the Debtors' cash flow and value would be helpful. Whether that is obtained prior to the need to file a plan is unknown at this point in time, and the

Debtors and parties in interest may have to proceed with a plan before there are any absolutely clear answers. But sometimes that there is no immediate or near term change in a market informs projections and valuation. The issue of corporate authority was certainly such a contingency but now has been resolved, creating an environment for negotiation.

## **CONCLUSION**

27. The Debtors respectfully submit that "cause" exists for an extension of the Exclusivity Periods. The factors usually considered by Courts in considering whether cause exists all support an extension. The Debtors are committed during the requested extension of time to negotiate diligently and in good faith with creditor and equity constituencies in the hopes of achieving a total or partial consensus on a restructuring plan. Extending the Exclusivity Periods as requested is important to the success of that process.

**WHEREFORE,** the Debtors pray that, after notice and any hearing this Court deems necessary, that this Court enter an order extending the Debtors' exclusive right to file a plan of reorganization until December 15, 2015, and extending the Debtors' exclusive right to obtain acceptances of a plan of reorganization until February 15, 2015. The Debtors further pray for such other relief as the Court deems just and proper.

Dated: September 23, 2015.

                                            Respectfully submitted,

*/s/Tristan Manthey*
William H. Patrick, III (La. Bar No. 10359)
Tristan E. Manthey, (La. Bar No. 24539)
Cherie Dessauer Nobles, (La. Bar No. 30476)
**Heller, Draper, Patrick, Horn & Dabney, L.L.C.**
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6175
Telephone: 504-299-3300 // Fax: 504-299-3399
**Co-Counsel for Debtors**

And

Louis Phillips (La. Bar No. 10505)
**Gordon, Arata, McCollam, Duplantis & Eagan, LLC**
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801-1916
Telephone: 225-381-9643 // Fax: 225-336-9763
Direct Phone: 225-338-5308
**Co-Counsel for Debtors**