UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| IN RE | : | CASE NO. 15-50748 |
| | : | |
| HARVEST OIL & GAS, LLC, *ET AL*[1] | : | CHAPTER 11 |
| | : | |
| DEBTORS. | : | JOINTLY ADMINISTERED |

**MOTION OF DEBTORS (1) TO SELL PROPERTY OF THE ESTATES FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS UNDER 11 U.S.C. § 363; AND (2) TO ASSIGN (OR ASSUME AND ASSIGN TO THE EXTENT NECESSARY) CERTAIN LEASES AND EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. § 365**

By this motion (the "Motion"), Harvest Oil and Gas, LLC, Saratoga Resources, Inc., The Harvest Group LLC, Lobo Operating, Inc. and Lobo Resources, Inc., as debtors and debtors-in-possession (collectively, the "Debtors"), by and through undersigned counsel, hereby move this Court pursuant to sections 105, 363, 365 and 506(c) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure and any local rules as may be applicable to this Motion (the "Bankruptcy Rules"), for entry of orders: (1) authorizing the sale of substantially all of the Debtors' oil, gas and mineral assets (other than the Debtors' federal oil and gas leases and any other assets agreed to be excluded), including the oil and gas leases commonly known as Grand Bay, Breton Sound 18, Breton Sound 32, Breton Sound 51, Main Pass 25, Main Pass 46, Main Pass 47, Main Pass 52, Vermillion 16, Crooked Bayou, Lake Fortuna, Little Bay and South Atchafalaya Bay and all equipment, records and other assets related thereto, all as more specifically described in

---

[1] Saratoga Resources, Inc. (15-50749); The Harvest Group LLC (15-50750); LOBO Operating, Inc. (15-70751); and LOBO Resources, Inc. (15-50752) are being jointly administered with Harvest Oil & Gas, LLC (15-50748) pursuant to a court order [P-4] entered on June 19, 2015.

1

{00351432-5}

an Exhibit to be filed no later than fifteen (15) days prior to the hearing on the Motion ("Sale Hearing") or as otherwise ordered by the Court, (collectively, all included properties, the "Subject Assets") to Energy Reserves Group II, LLC ("ERG II"), or if not ERG II, to the highest bidder as determined by the Bankruptcy Court (the "Winning Bidder")[2] at the Sale Hearing, free and clear of all liabilities, liens, claims, encumbrances and interests other than the Carve-Out (defined below) and any ad valorem taxes on the Subject Assets (the "Existing Liens"), (2) authorizing the assignment (or assumption and assignment to the extent necessary) to ERG II (or such Winning Bidder) of certain leases and executory contracts ("Leases and Contracts") which shall be set forth in an Exhibit to be filed no later than fifteen (15) days prior to the Sale Hearing or as otherwise ordered by the Court, and (3) such other related relief. In support of this Motion, the Debtors respectfully represent as follows:

**Jurisdiction**

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409.

**Background**

**A.    General Background**

2. On June 18, 2015, the Debtors filed for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy

---

[2] The Debtors have filed a separate motion requesting that the Court approve certain bid procedures applicable at the Sale Hearing on the proposed sale of the Subject Assets.

2

{00351432-5}

Code. On June 19, 2015, the Court entered an order [P-4] that these chapter 11 cases be jointly administered and consolidated for procedural purposes.

3. On July 24, 2015, an official unsecured creditors committee (the "Unsecured Creditors Committee") was appointed by the United States Trustee [P-171]. On September 4, 2015, the Court entered an order [P-397] authorizing the employment of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard as counsel for the Unsecured Creditors Committee.

4. On August 11, 2015, an official committee of equity holders ("Equity Committee") was appointed by the United States Trustee [P-290]. On October 6, 2015, the Court entered an order [P-508] authorizing the employment of Gardere Wynne Sewell LLP as counsel to the Equity Committee.

**B.  TRANSFER OF NOTES TO ERG II**

5. Prior to the Petition Date, the Debtors entered into that certain Indenture dated as of November 22, 2013 with the Bank of New York Mellon Trust Company, N.A., as trustee, pursuant to which, among other things, the Debtors issued notes ("First Lien Notes") to certain holders ("First Lien Noteholders"). The First Lien Noteholders were granted valid, perfected, enforceable and non-avoidable first priority security interests in and continuing liens on substantially all of the Debtors' assets.

6. The Debtors also entered into that certain Indenture dated as of July 12, 2011, and Wilmington Savings Fund Society, FSB, successor to Bank of New York Mellon Trust Company, as trustee, pursuant to which, among other things, the Debtors issued notes ("Second Lien Notes") to certain holders ("Second Lien Noteholders"). The Second Lien Noteholders were granted valid, perfected, enforceable and non-avoidable

3

{00351432-5}

second priority security interests in and continuing liens on substantially all of the Debtors' assets.

7. On March 14, 2016, ERG II purchased the First Lien Notes and the Second Lien Notes owned by Blackstone/GSO Capital Solutions Fund L.P., Blackstone/GSO Capital Solutions Overseas Master Fund L.P., Stonehill Master Fund Ltd. and Stonehill Institutional Partners, L.P. ("Former Majority First Lien Noteholders"). Based on this transfer, ERG II now owns 100% of the First Lien Notes in the approximate amount of $54.6 million, plus accrued interest and also owns approximately 75% of the Second Lien Notes in the approximate amount of $97.6 million, plus accrued interest.

8. On March 16, 2016, ERG II filed the *Motion of Energy Reserves Group, II to Convert Chapter 11 Cases to Chapter 7 Cases Pursuant to Bankruptcy Code §1112* [P-792] ("Motion to Convert"), requesting the Court convert the Debtors' chapter 11 cases to cases under Chapter 7. A hearing on the Motion to Convert is scheduled for April 7, 2016.

**Proposed Sale of Subject Assets**

9. By this Motion, the Debtors request that this Court enter a sale order (the "Sale Order") authorizing and directing the Debtors to sell the Subject Assets to ERG II (or the Winning Bidder) free and clear of any and all Existing Liens, as more particularly stated hereinafter, for the consideration consisting of (i) satisfaction and discharging the liens securing the First Lien Notes (whether by credit bid or cash), (ii) payment in cash upon the closing of the sale of the Subject Assets of all fees and expenses which are due

under the Carve- Out[3] set forth in the CCO and the CC Stipulations in the approximate amount of $1.1 million as of May 31, 2016, including the reasonable professional fees and expenses that are related to or incurred in connection with the sale of the Subject Assets, whether or not then allowed, and (iii) assumption and payment in full the ad valorem taxes including any interest and penalties due thereon on the Subject Assets in the approximate amount of $2.2 million as of May 31, 2016 plus the ad valorem taxes including any interest and penalties due thereon accruing thereafter.

---

[3] On September 22, 2015, this Court entered the *Final Cash Collateral Order* [P-481] ("CCO"). Section 24 of the CCO provides:

> As used in this Order, "Carve-Out" means (A) any and all expenditures authorized or made pursuant to an Approved Budget , whether or not paid, including, without limitation: (i) the unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. §1930(a)(6), (ii) the reasonable unpaid fees, disbursements, costs, and expenses incurred by the Debtor Professionals prior to the Termination Date and in accordance with the Approved Budget, to the extent allowed by the Bankruptcy Court, whether by interim order, procedural order or otherwise, (iii) the reasonable unpaid fees, disbursements, costs, and expenses incurred prior to the Termination Date and in accordance with the Approved Budget of professionals retained by the Committees (the "Committee Professionals") and all reasonable unpaid out-of-pocket expenses of the members of the Committee, in each case to the extent allowed by the Bankruptcy Court, whether by interim order, procedural order or otherwise and (iv) after the expiration of the Remedies Notice Period, the sum of $200,000, less the sum of any retainer held by such professional, for fees, disbursements, costs, and expenses incurred by the Debtor Professionals and the sum of $50,000, less the sum of any retainer held by such professional, for fees, disbursements, costs, and expenses thereafter incurred by the Committee Professionals, if any….

The Debtors and the Majority First Lien Noteholders also entered into numerous *Stipulations Regarding Extension of Use of Cash Collateral* [P-731, 745, 756, 770, 800] ("CC Stipulations"), which provide:

> For purposes of the Carve Out under the Final CCO, the actual fees and expenses of Heller, Draper, Patrick, Horn & Dabney, L.L.C., Gordon, Arata, McCollam, Duplantis & Eagan, LLC (for December 2015) and Kelly Hart & Petrie, bankruptcy counsel for the Debtors, and Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, bankruptcy counsel for the Unsecured Creditors Committee, incurred during the months of December 2015, January 2016, February 2016, March 2016 and April 2016 prior to the expiration of any Remedies Notice Period shall constitute "expenditures authorized or made" pursuant to Paragraph 24(A)(i) of the Final CCO, whether or not paid, to the extent allowed by the Bankruptcy Court, whether by interim order, procedural order or otherwise.

**C.     Leases and Contracts**

10. On December 16, 2015, the Debtors filed *Motion for Entry of an Order Authorizing the Debtors to Assume Unexpired Leases of Nonresidential Real Property, Oil and Gas Leases and Related Contracts* [P-652] ("Assumption Motion"), requesting the Court authorize the Debtors to assume certain unexpired leases of nonresidential real property, oil and gas leases and related contracts, including the Leases and Contracts.

11. After notice and a hearing, on January 14, 2016, the Court entered an *Order Granting Motion for Entry of an Order Authorizing the Debtors to Assume Unexpired Leases of Nonresidential Real Property, Oil and Gas Leases and Related Contracts* [P-718] ("Assumption Order"), granting the Assumption Motion, thereby, authorizing the Debtors to assume the leases and contracts set forth in the Assumption Motion, including the Leases and Contracts.

**Proposed Assignment (or Assumption and Assignment to the Extent Necessary) of Leases and Contracts**

12. By this Motion, the Debtors also seek entry of an order (an "Assignment Order", which may be included as part of the Sale Order) (1) authorizing the Debtors to assign (or assume and assign to the extent necessary[4]) unto ERG II (or the Winning Bidder) the Leases and Contracts set forth on the Exhibit to be filed in connection with the Motion pursuant to 11 U.S.C. §§ 105 and 365; (2) establishing the cure amounts ("Cure Amounts"), if any, relating to the Leases and Contracts; and (3) finding that ERG II (or the Winning Bidder) has demonstrated adequate assurance of future performance under the Leases and Contracts. In accordance with the mutual understanding of the parties, any defaults, including monetary defaults, that must be cured in order to assign

---

[4] To the extent any of the Leases and Contracts were not assumed pursuant to the Assumption Order, the Debtors are seeking both the assumption and assignment of those Leases and Contracts.

(or assume and assign to the extent necessary) these Leases and Contracts shall be the sole responsibility of ERG II (or the Winning Bidder). The Debtors shall include in in the Exhibit to be filed with the Court the cure amounts the Debtors and ERG II the Purchaser assert are owed to the counterparties to the Leases and Contract (or the Winning Bidder).

13. The Debtors also request that the Assignment Order provide that upon the closing and payment of the Cure Amounts if any, (i) all defaults of the Debtors under the Leases and Contracts assigned (or assumed and assigned) to ERG II (or the Winning Bidder) shall be deemed cured with respect to each such assigned (or assumed and assigned) Lease and Contract, (ii) no remaining Cure Amounts are due and owing under the Leases and Contracts (and there is no compensation due for any actual pecuniary loss and no other amount due prior to the assignment (or assumption and assignment) other than as may be set forth in the Exhibit to be filed with the Court or order of the Court determining the Cure Amounts), (iii) there is adequate assurance of future performance with respect to each such assigned (or assumed and assigned) Lease and Contract, (iv) such assignment (or assumption and assignment) of each such assigned (or assumed and assigned) Lease and Contract is in the best interests of the Debtors and their estates, (v) each such assigned (or assumed and assigned) Lease and Contract constitutes a legal, valid, binding and enforceable contract in accordance with the terms thereof; and (vi) the performance of each such Lease and Contract after the closing will be the responsibility of ERG II (or the Winning Bidder)pursuant to 11 U.S.C. §365(k) and Debtors shall have no further obligations thereunder.

7
{00351432-5}

15-50748 - #827  File 04/01/16  Enter 04/01/16 14:27:02  Main Document  Pg 7 of 18

## The Sale of the Subject Assets Should be Approved

14. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, a sale of a debtor's assets should be authorized when there is an articulated business justification for doing so. See Licensing by Paolo v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997); see also In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991); In re Telesphere Communications, Inc., 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983).

15. Whether a transaction has a sufficient articulated business justification depends on the facts of the case. See In re Continental Airlines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986). A bankruptcy court should consider "all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders alike." Continental, 780 F.2d at 1226; Lionel, 722 F.2d at 1071. Relevant factors may include: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition on the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value." See Continental, 780 F.2d at 1226; Lionel, 722 F.2d

at 1071; In re Delaware & Hudson R.R. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Condere Corporation, 228 B.R. 615, 628 (Bankr. S.D. Miss. 1998).

16. When applying the "business judgment" standard, courts show deference to a debtor's business decisions. See, e.g., Atkins v. Hibernia Corp., 182 F.3d 320, 324 (5th Cir. 1999); GBL Holding Co. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Group, Ltd.), No. Civ. A. 3:04-CV-2411-M, 2005 WL 440379, *2 (N.D. Tex. Feb. 23, 2005) ("great judicial deference is given to [the debtor in possession's] exercise of business judgment").

17. In summarizing the relevant case law on Section 363 sales, (former) Judge Wesley Steen identified the following questions courts often ask when determining whether to approve a § 363 sale prior to confirmation of a chapter 11 plan:

> a. Is there evidence of a need for speed?
> b. What is the business justification?
> c. Is the case sufficiently mature to assure due process?
> d. Is the proposed asset purchase agreement sufficiently straightforward to facilitate competitive bids or is the purchaser the only potential interested party?
> e. Have the assets been aggressively marketed in an active market?
> f. Are the fiduciaries that control the debtor truly disinterested?
> g. Does the proposed sale include all of a debtor's assets and does it include the "crown jewel"?
> h. What extraordinary protections does the purchaser want?
> i. How burdensome would it be to propose the sale as part of confirmation of a chapter 11 plan?

*See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 423-425 (Bankr. S.D. Tex. 2009).

18. The evidence at the hearing on the Motion will establish that the answers to the questions identified by *In re Gulf Coast Oil Corp*, as relevant to the consideration of the sale of all or substantially all of the Debtors' Subject Assets under Section 363(b), support the approval of the sale of the Subject Assets as proposed in this Motion.

9

{00351432-5}

15-50748 - #827  File 04/01/16  Enter 04/01/16 14:27:02  Main Document  Pg 9 of 18

19. The Debtors have determined that prompt consummation of a sale is the best way to maximize the value of the Debtors' Subject Assets for the benefit of all constituencies. Given the financial condition of the Debtors and the pending Motion to Convert, a sale of the Subject Assets is the best option available and will maximize the value of the estates. Additionally, ERG II (or the Winning Bidder) will be paying a significant portion of the administrative expenses of the Debtors' estates including the ad valorem taxes related to the Subject Assets, which is the in the best interests of the Debtors' estates. If a sale is not concluded soon, the continuing expenses of the estates, whether in a chapter 7 or 11, will erode the value of the estates of the Debtors. With the sale, there is a reasonable chance of filing and confirming a plan of reorganization which will be supported by the creditors of the estates.

20. There is no need for any additional marketing of the Subject Assets. This is so for a number of reasons:

(a) First, the Subject Assets have been marketed vigorously by management and the Lenders. The Debtor's management has been trying to raise capital for the purchase or refinancing of the Subject Assets for more than a year. Dozens of prospective lenders and buyers have signed confidentiality agreements and had access to data rooms maintained by the Debtors. In connection with those efforts, numerous proposals were received for the purchase and or recapitalization of the Debtors, some with significant recoveries to unsecured creditors and to existing equity holders. For whatever reasons, none of these proposals were deemed acceptable to the Former Majority First Lien Noteholders.

10
{00351432-5}

15-50748 - #827 File 04/01/16 Enter 04/01/16 14:27:02 Main Document Pg 10 of 18

(b) Second, it is also well known that the Former Majority First Lien Noteholders have been interested in selling their position for a substantial discount, for a considerable period of time, and great efforts have been made to obtain offers for the Subject Assets (or the notes secured by the Subject Assets). Ultimately, although there were other possible prospects for the sale of the Notes and/or for the financial restructuring of the Debtors, some of which would have provided value to other creditors and equity holders, the Former Majority First Lien Noteholders chose to sell their position to ERG II.

(c) Third, upon information and belief, ERG II is a strategic buyer and wants to obtain title to the Subject Assets. Since ERG II is the holder of the First Lien Notes and 75% of the Second Lien Notes, ERG II can credit bid (or bid cash which they would then put in their own pockets on account of their liens) for the purchase of the Subject Assets substantially more than any other cash bidder would possibly bid for the Subject Assets. Any increase in the purchase price for the Subject Assets at the Sale Hearing as a result of additional marketing of the Subject Assets would be for the sole benefit of ERG II and would not improve the position of any other creditors of the estate. Upon information and belief, ERG II is not seeking to arbitrage its recent purchase of the notes secured by the Subject Assets and is not insisting on any additional marketing process prior to the Sale Hearing. ERG II is the sole entity possibly affected by any additional marketing of the Subject Assets. If ERG II wants to delay the Sale Hearing for the Debtors to continue

marketing the Subject Assets, then the Debtors will certainly do so, but frankly, under the circumstances, given the amount of secured debt against the Subject Assets held by ERG II, doing so would be a complete waste of time and a vain and useless action.

21. Based on the foregoing, the Debtors have determined in their sound business judgment that a sale of the Subject Assets to ERG II (or any Winning Bidder) is fair and reasonable and in the best interest of the estates, creditors, and all parties in interest in these chapter 11 cases, and request that the Court approve the sale of the Subject Assets to ERG II (or any Winning Bidder).

22. The Debtors also request that this Court authorize and direct them to take all actions necessary or useful to effectuate the sale of the Subject Assets to ERG II (or any Winning Bidder) and the transactions described or contemplated herein, including: (1) the execution and delivery of appropriate agreements or other documents; (2) the execution and delivery of instruments of sale, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation; (3) the filing of appropriate certificates with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that are necessary, appropriate and useful to consummate the transactions provided in or contemplated herein or the Sale Order approving the Motion.

### **ERG II Has the Right to Credit Bid**

23. Section 363(k) provides:

At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

12

{00351432-5}

15-50748 - #827  File 04/01/16  Enter 04/01/16 14:27:02  Main Document  Pg 12 of 18

24. ERG II holds secured claims against the Debtors in the approximate amount of $54.6 million, plus accrued interest on the First Lien Notes, and approximately $97.6 million, plus accrued interest on the Second Lien Notes.

25. There is no dispute with respect to the validity and enforceability of the liens securing the First Lien Notes or the Second Lien Notes. The Court established a "Challenge Period" for the Unsecured Creditors Committee to challenge stipulations made by the Debtors in the CCO with respect to the validity and enforceability of the pre-petition liens securing the First Lien Notes and the Second Lien Notes and the pre-petition amounts due thereunder. There was no challenge made by the Unsecured Creditors Committee, and therefore, under the CCO, the pre-petition liens securing the First Lien Notes and the Second Lien Notes "constitute valid, binding, enforceable, nonavoidable, and properly perfected liens". *See* CCO, ¶12(e).

26. Accordingly, ERG II has the right to credit bid up to the full amount of its secured claims under 11 U.S.C. §363(k). And even if ERG II did not have the right to credit bid, because of its huge unavoidable liens on the Subject Assets, it would be in a position to bid cash for the Subject Assets far beyond what any other cash bidder can bid, because ERG II gets to pay itself whatever cash it bids for the Subject Assets.

### Sale Free and Clear of Liens, Claims, Encumbrances, and Interests

27. Under section 363(f) of the Bankruptcy Code, a trustee may sell property free and clear of any lien, claim, or interest in such property if, among other things:

> (i) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (ii) such entity consents;

(iii) such interest is a lien and the price at which the property is sold is greater than all liens on such property;

(iv) such interest is in bona fide dispute; or

(v) such entity could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such interest.

28. In this Motion, the Debtors request authorization to sell the Subject Assets free and clear of any and all Existing Liens. Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements is sufficient to permit the sale to be free and clear of any and all Existing Liens. Here, a "free and clear" sale is warranted because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code will be satisfied.

29. Accordingly, the Debtors request that, after a hearing on the Sale Motion, the Subject Assets be sold to ERG II (or the Winning Bidder), free and clear of any and all Existing Liens.

## Good Faith Purchaser

30. Section 363(m) of the Bankruptcy Code provides that:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

31. ERG II is in good faith and entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

14

{00351432-5}

15-50748 - #827  File 04/01/16  Enter 04/01/16 14:27:02  Main Document  Pg 14 of 18

## Notice

32. Notice of this Motion has been provided to (i) the Office of the United States Trustee; (ii) the Debtors and their counsel; (iii) those persons who have formally appeared and requested notice and service in this proceeding pursuant to Bankruptcy Rules 2002; (iv) counsel for any official committees appointed by this Court; (v) Energy Reserves Group II, LLC; (vi) the twenty (20) largest unsecured creditors of the Debtors on a consolidated basis; (vii) the Securities and Exchange Commission, (viii) governmental agencies having a regulatory or statutory interest in these cases; (ix) the counterparties to the Leases and Contracts; and (x) the Debtors' consolidated matrix. The Debtors submit that no other or further notice need be provided.

**WHEREFORE,** the Debtors, pray that, after notice and a hearing, this Court enter a Sale Order:

(1) authorizing and directing the Debtors to sell the Subject Assets to ERG II (or the Winning Bidder) free and clear of any and all other Existing Liens in consideration of ERG II (or the Winning Bidder) (i) satisfying and discharging the liens securing the First Lien Notes (whether by credit bid or cash), (ii) payment in cash upon the closing of the sale of the Subject Assets of all fees and expenses which are due under the Carve-Out set forth in the CCO and the CC Stipulations in the approximate amount of $1.1 million as of May 31, 2016, including the reasonable professional fees and expenses that are related to or incurred in connection with the sale of the Subject Assets, whether or not then allowed, and (iii) assuming and/or paying in full the ad valorem taxes including any interest and penalties due thereon, on the Subject Assets in the approximate amount of

15

$2.2 million as of May 31, 2016 plus the ad valorem taxes including any interest and penalties due thereon accruing thereafter;

(2) finding Energy Reserves Group II, LLC has the right to credit bid the full amount of its secured claim under 11 U.S.C. §363(k);

(3) finding Energy Reserves Group II, LLC to be a good faith purchaser within the meaning of 11 U.S.C. § 363(m);

(4) including as part thereof an Assignment Order, (a) authorizing the Debtors to assign (or assume and assign to the extent necessary) unto ERG II (or the Winning Bidder) the Leases and Contracts set forth on the Exhibit to be filed with the Court pursuant to 11 U.S.C. §§ 105 and 365; (b) establishing the Cure Amounts relating to the Leases and Contracts; (c) finding that ERG II (or the Winning Bidder) has demonstrated adequate assurance of future performance under the Leases and Contracts; and (d) providing that upon the closing and payment of the Cure Amounts if any, (i) all defaults of the Debtors under the Leases and Contracts assigned (or assumed and assigned) to ERG II (or the Winning Bidder) shall be deemed cured with respect to each such assigned (or assumed and assigned) Lease and Contract (ii) no remaining Cure Amounts are due and owing under the Leases and Contracts (and there is no compensation due for any actual pecuniary loss and no other amount due prior to the assignment (or assumption and assignment) other than as may be set forth in the Cure Notice or order of the Court determining the Cure Amounts), (iii) there is adequate assurance of future performance with respect to each such assigned (or assumed and assigned) Lease and Contract, (iv) such assignment (or assumption and

assignment) of each such assigned (or assumed and assigned) Lease and Contract is in the best interest of the Debtors and their estates, (v) each such assigned (or assumed and assigned) Lease and Contract constitutes a legal, valid, binding and enforceable contract in accordance with the terms thereof; and (vi) the performance of each such Lease and Contract after the closing will be the responsibility of ERG II (or the Winning Bidder) pursuant to 11 U.S.C. §365(k) and the Debtors shall have no further obligations thereunder;

(5) authorizing and directing the Debtors to take all actions necessary or useful to effectuate the sale of the Subject Assets and the transactions described or contemplated herein, including: (a) the execution and delivery of appropriate agreements or other documents; (b) the execution and delivery of instruments of sale, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation; (c) the filing of appropriate certificates with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions necessary, appropriate and useful to consummate the transactions provided in or contemplated herein or in the Sale Order approving the Motion; and

(6) granting such other relief as is requested herein and is just and equitable.

[signature on next page]

17

{00351432-5}

15-50748 - #827  File 04/01/16  Enter 04/01/16 14:27:02  Main Document  Pg 17 of 18

Dated: April 1, 2016

Respectfully submitted,

*/s/ William H. Patrick, III*
William H. Patrick, III (La. Bar No. 10359)
Tristan E. Manthey, (La. Bar No. 24539)
Cherie Dessauer Nobles, (La. Bar No. 30476)
**Heller, Draper, Patrick, Horn & Dabney, L.L.C.**
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6175
Telephone: 504-299-3300
Facsimile: 504-299-3399
**Co-Counsel for Debtors**

**Louis M. Phillips (#10505)**
**Peter A. Kopfinger (#20104)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Email: peter.kopfinger@kellyhart.com

AND

**Patrick (Rick) M. Shelby (#31963)**
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: rick.shelby@kellyhart.com
**Co-Counsel for Debtors**